Number 181990 Antonio Santana-Vargas v. Banco Santander Puerto Rico et al. Good morning, Your Honors. Carlos Valla for the appellant. May I please record? Thank you. Your Honor, I'm sure you have all read our brief, so I would like to basically emphasize on a few points that I think are very important for our case. The district court held that the, when it comes to the prima facie case, it focused on the second prong of the test, which requires an employer, an employee to show that he was meeting the employer's expectations of the job at the time of employment termination. So the court concluded that the appellant was not meeting such job expectations. The record of this case is full of evidence showing that at the time of his job termination, he was in fact meeting the job expectations. He was placed on a performance improvement plan. There was an agreement with the employer, a written performance improvement plan, where he was placed on a six-month probationary period, and then the employer discharged him prior to the conclusion of such period. During such period, he was increasing, substantially increasing the numbers of the branch business. So in fact, four months later, he had increased the number by $143,000. There was no reason whatsoever for the bank to terminate his employment prior to the conclusion of such period. Counsel, is it not correct that although he had, what was required was a 2.65 rating? I'll stay away from all that goes into the rating, but for the six months prior to his termination, he never hit that mark once. That was the general requirement for all branches. Within the performance improvement plan period, there was no specific goal established. Why isn't that enough for the company to say he's not meeting our legitimate performance expectations? Because he was given six months to reach that goal. He was given six months to reach that goal, and he was very close to reaching that goal. When the company saw he was going to reach it, they fired him immediately because of the reasons that we have raised in our argument, that they were discriminating against him. So the goal, the 2.65 number was the general rule for branches, but during that performance improvement plan, he was given that time to reach that number. It was not, I mean, if he had, if he would have been able, if he would reasonably be able, he would not do it. Excuse me. Is that what the PIP says? You have six months, and at the end of six months, we'll see if you reach the number? Because my understanding is that for four of those six months, he's way below two. The PIP doesn't say that, but it doesn't say the other way around. It doesn't say that he has to meet the 2.65 every month. It doesn't say that. In fact, there was no goal. My point is he didn't come close in four of the six months. Why is that? Why doesn't that make the company's action reasonable when he fails to make his prima facie case out? I'm just asking you. I haven't reached any conclusions. I just want to know. Yes, Your Honor, I disagree. I mean, there is evidence on the record that he did come very close to reaching that after four months. When he was fired, he was very close to reaching the 2.65. So that is on the record. The difficulty I'm having here with this is he had these unchallenged, for the purpose of this case, very low scores repeatedly for several periods of time. But they didn't let him go. They put him on a six-month performance plan. And then before the end of that plan, they then fired him. And if they had suddenly discovered his age halfway through the performance plan, then maybe I could see how you start to tease some nexus out. But I'm assuming that instead of firing him, they put him on the plan. They knew his age. Yes, Your Honor, but there are two things in response to your question. If that's the case, though, I think what you're asking us to rule in effect is that the six-month plan was essentially a guarantee of employment, that they couldn't decide not enough improvement while firing you. Well, not a guarantee, but Supreme Court case law, specifically the case of Santiago v. are part of the employment contract. So I pay you money for you to give me service, a service that complies with the company rules. So the company establishes specific rules, establishes a PIP, a performance improvement plan, and then does not comply with the same, breaches the pledge between the employees. But where is it in the plan that says he can't be discharged during the performance period? Whether it says it or not, it doesn't say it, but that was the agreement. You have six months to improve the branch's numbers, and he did it substantially. From all I could tell from the record, it wasn't a guarantee that they'd get the six months. It's that you're going to be fired if you don't improve during the six months. That doesn't mean you won't be fired otherwise. That's what PIPs do. I mean, the PIP is the last opportunity for an employee to show improvement. I mean, if then, if we follow your argument, then why six months? I mean, if you give them six months because it's a period of time that he has to improve, then why establish a time period? Could they have fired him without even putting him on the PIP? Well, there are some arguments in the record and some evidence also because the bad performance in the previous years had been, it was not warranted, all the letters. He was sent to a branch that had been subject of fraud, so he was sent there and he tried to improve that branch, and then he was sent to this other branch. So are you claiming the earlier bad performance reviews were themselves the result of age discrimination? No. But then we, so if you've got untainted bad performances, correct or not, you've got the bad performances. But it goes to the second front of the test, because the second front requires to show that he was meeting the job's expectations. And at the time of his employment termination, he was meeting the job's employment expectations. Those other warnings that were given to him concerning performance, when he was assigned to the Otuado branch, one of the, another nearby municipality, it's at Juntas, closed operations, and all the customers of that branch were assigned to his branch, even though there were two other branches that were closer in distance. So what happened was that he received that book of clients, and immediately after receiving that, and that is part of, now it's part of his record, and he has to comply with quotas concerning that book of clients. But immediately those clients began to leave to other two branches because they were closer, were nearby their homes. So immediately that began to affect his performance, and that's part of the record. So the company is saying, this is their argument, this is an employee who has been performing badly for the last five years. When you look clearly at the previous four years, there is abundant evidence on the record that it's true that the branches were not performing adequately, but he had been improving them based on the specific circumstances and what had happened, the very bad branches that were given to him. And then in the last six months, when you see the warnings that he was given, they put him on a performance improvement plan, and they began to give him warnings every month, every month, every month, and clearly he had six months to, you know, improve the branches, the branch numbers, which he did. When you say that the six months was part of the contract, in this case it amounted to a guarantee, what do you make of the language in the PIP policy that says that the right to act according to the merits in each case as the circumstances may require it? What do you do with that language? Well, I understand the circumstances in this particular case clearly show that he was improving. There is no evidence on the record justifying the dismissal. He was put on a PIP, and immediately he began to improve. Nothing happened negative to him that justified the dismissal, other than the reasons that we claim. Well, the evidence showing the discriminatory comments of supervisors, you know, that we're hiring younger people, new blood, that why this lady doesn't retire, I can't wait for her to go, and then penalizing another employee because she reported the worker scum. So it's a disparate treatment, not based on age. But you can see the discriminatory intent of the two, the immediate supervisor, and the general director, Jeanette Villamil, making discriminatory comments. In this day and age, and I submit to you respectfully, I mean, I think it's part of the opportunity this court has. In this day and age, I mean, everybody knows you cannot discriminate based on age or any of the protected categories. I mean, we have Internet, there's information, everybody knows about that. So employers who want to discriminate, they look for more subtle ways of doing it. But when you look at the totality of the circumstances, and you look how there was no reason, nothing negatively happened to him after he was placed on the PIP, for the company to get rid of him, nothing happened. So why did they get rid of him? And then when you look at the totality of the circumstances, at the comments that were being made, the fact that there were 58% other branch managers with worse performance than him, and nothing happened to them, the fact that there was another lady, a younger branch manager who was given an extension of the PIP, who only had 10 years of service when he had 28 years of service. When you look at the totality of the circumstances, that's why we understand that the plaintiff complied, that the appellant complied with the minimum evidence required for showing not only the prima facie case,  Thank you. Good morning, Your Honors. May I please report? This is Attorney Alberto Bayou on behalf of Defendants' Appellees Banco Santander and Santander Financial. Your Honors, with regards to appellant's contention regarding whether or not the second prong of the prima facie case was met, it is uncontested based on the evidence on the record that Mr. Santander had serious performance issues dating back to 2009 up until his termination in 2014. He had subpar performance evaluations in 2011, 2012, 2013, all well below the 2.65 benchmark. That is in a scale between one to five being the highest. With regards to the PIP in 2014, it is also uncontested that he was unable to attain the goals that were set out in that PIP for each month beginning from January up until June. Therefore, it is very evident that Mr. Santander did not meet the Santander Financial's expectations. Now, having said that, assuming that such expectations were met, Santander Financial was able to provide or proffer a legitimate non-discriminatory reason for his termination. How do you explain that he was performing better than 58% of the other branch managers? Your Honor, I would like to clarify that data because that is a statistic that Mr. Santander, you know, he calculated and presented it on his brief that is not subject of the opinion and order. So that is just a calculation that he made based on the evidence on the record. What is uncontested, if you go to the court's opinion and order, and which was brought up on appeal, was the fact that at the time of Mr. Santander's termination, there were 55 branch managers. Of those 55 branch managers, there were 42 branch managers that were under the protected age. And of all those, there were 10 other branch managers that were the same age as Mr. Santander or older that were still working for Santander Financial. So clearly, based on that evidence, any allegation regarding any type of disparate treatment or that other similarly situated younger branch managers were treated favorably and that him, you know, it is not supported by the record. In fact, if you go to... that he was performing 58%. Because didn't the district court make a statement that it is going to be interesting, a question for the Court of Appeals? As to whether he was performing under 58? To make a determination as to whether there is discrimination when he is performing in the 58th. I don't recall if that was in one of the footnotes or not, but I just recall that based on the numbers, his last numbers for June prior to his termination were 2.5, Your Honor. So that was the highest he was able to attain. He never surpassed 2.65. He is talking in terms of monetary... He is making an argument that as to his comparators, other branch managers, he was performing better than them, but was still let go. And you are saying that there is nothing in the record to support that he was performing 58 to 42? The problem is that his plaintiff appellant posits that there were 30 other branch managers. However, he was unable to specify how those other branch managers were similarly situated to Mr. Santana in all aspects. There is only what is clear from the record that at least Mrs. Velasco was substantially younger than him, and like Mr. Santana, she had performance issues prior to being placed on that PIP for three years before she was placed on the PIP. And like Mr. Santana, she was not able to attain the goals for the PIP in 2014, and she was terminated the same as Mr. Santana before the PIP concluded. Now, Mr. Santana mentions that there was another employee, Mrs. Rivera, that was substantially younger than him, but whose PIP was extended. The problem is that in her case, they were not similarly situated. First and foremost, Mrs. Rivera had a different supervisor than Mr. Santana. Mrs. Rivera's supervisor was Mr. John Rivera, whereas Mr. Santana's supervisor was William Mejias. Furthermore, there is no evidence on the record that in the case of Mrs. Rivera, when she was placed on the PIP, that she had the same performance woes or problems or history as Mr. Santana. And unlike Mr. Santana, while she was placed on the PIP, there was at least one month where she was able to attain or surpass the minimum threshold, the 2.65 goal that was set. So taking that evidence, which is uncontested, the court was right in making that determination that there was no differential treatment between Mr. Santana and other branch managers. There was also another branch manager who was also placed on the PIP, but she did not return to work because she went on leave and did not return to work. And with regards to Mr. Santana's contention regarding the comments, it's important that you need to analyze those comments in terms of when they took place and whether or not they were related to any adverse action that Mr. Santana might have suffered. The comments where he refers to were those made by Mrs. Mejias and Mrs. Genevieve Jamil. The thing is that the comments that were made by Mr. and Mrs. Genevieve Jamil were made more than a year before Mr. Santana was terminated. And the comments, there is no, it is uncontested, were not directed at him. They were made out in a meeting with other employees of the bank, and she did not say when she made that comment that they were going to get rid of all employees. As I stated earlier, it is in the record that at the time of Mr. Santana's termination, if you take that date, 2014, August 8, there were still older branch managers, older than Mr. Santana was still working there at Santander Financial. Now, with regards to the other comment, the ones that were made by Mrs. Mejias, those are more close to Mr. Santana's termination since they were allegedly taken place on April 2014. The problem is that, again, those comments were not directed at him. It involved another employee, that's Mrs. Lucy Torres, and at no point did she mention her age or that she wanted to get rid of her because of her age. So those comments, both by Mr. Mejias and Mrs. Genevieve, are too ambiguous to make any inference of discrimination. And now, with regards to Mr. Modolfino's comment, who was the former president of Santander Financial, that comment also is too remote in time. That took place in between May and June 2013, and that was more than a year before Mr. Santana was terminated. And the other comments that we have discussed also did not involve or relate to Mr. Santana's age in any way. Simply put, at the time that Mr. Santana was terminated, Mr. Modolfino was not a decision maker. He did not participate in the decision to terminate Mr. Santana. Your Honor, I don't know if you have any particular questions that you want me to address. No, thank you. Okay, thanks. Thank you both.